UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| LISA O. L.,[1] <br><br>    Plaintiff, <br><br>v. <br><br>KILOLO KIJAKAZI, <br><br>    Defendant. | Case No. 20-cv-02865-RMI <br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** <br><br>Re: Dkt. Nos. 23, 30 |

Plaintiff, seeks judicial review of an administrative law judge ("ALJ") decision denying her application for a period of disability and insurance benefits under Title II of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 7 & 12), and both parties have moved for summary judgment (dkts. 23 & 30). For the reasons stated below, Plaintiff's motion for summary judgment is granted, Defendant's motion is denied, and the case is remanded for further proceedings.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

"substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**PROCEDURAL HISTORY**

On February 14, 2017, Plaintiff filed an application for Title II benefits, alleging an onset date of January 1, 2014. *See* Administrative Record "*AR*" at 15.[2] As set forth in detail below, the ALJ found Plaintiff not disabled and denied the application on April 17, 2019. *Id*. at 15-29. The Appeals Council denied Plaintiff's request for review on February 25, 2020. *See id*. at 1-4. Thereafter, on April 25, 2020, Plaintiff sought review in this court (dkt. 1) and argued *inter alia*: that the ALJ improperly rejected lay witness testimony as well as Plaintiff's testimony; that the Step-Five finding is not supported by substantial evidence; and, that the residual functional capacity ("RFC") finding was not supported by substantial evidence. *See* Pl.'s Mot. (dkt. 23-1) at 15-27. Defendant contends that no such errors were committed, and that each of the ALJ's findings rest on a foundation of substantial evidence. *See* Def.'s Mot. (dkt. 30) at 3-9.

**SUMMARY OF THE RELEVANT EVIDENCE**

While Plaintiff has raised a number of issues in this court (including claims that the ALJ's formulation of the residual functioning capacity and her Step Five determination were erroneous), the court does not reach those issues because the record in this case contains certain evidence

---

[2] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #20. *See* (dkts. 20-1 through 20-18).

2

possibly indicating a cognitive impairment for which the record was not fairly or properly developed. Because the court is of the opinion that the record has been insufficiently developed in this regard, the following is a recitation of the relevant evidence underlying that conclusion. In addition to suffering from various spine disorders, hearing loss, a seizure disorder, and a depressive mood disorder (dysthymic disorder) (*see* AR at 17-18), there is substantial record evidence indicating that Plaintiff also suffers from one or more cognitive disorders. Accordingly, the case must be remanded because the record was poorly developed in this regard and because the ALJ's decision simply overlooked this evidence.

Initially, the court will note that during the hearing, the ALJ inquired about some of this evidence – in a generalized and casual fashion – by asking Plaintiff: "[s]o, we sent you to a doctor that says you would - - you have an issue with your concentration. Do you think that's true?" *Id*. at 56. Plaintiff responded to the following effect: "[y]es, I had seizures back in 2014 and I had lost 90% of my memory and so at times it go[es] away and then it come[s] back and . . . [i]t just varies . . . it comes and goes." *Id*.

In May and June of 2014, Plaintiff's family medicine physician, Marcie Richmond, M.D., made the observation that Plaintiff's reports of her memory deficits appear to be connected to her seizures; further, Dr. Richmond also noted some instances of auditory hallucinations. *Id*. at 475, 489. Thereafter, in April of 2016, one of Plaintiff's treating neurologists, Shaista Rauf, M.D., noted that Plaintiff "is having poor memory [and] [r]ight after the first seizure she forgot the name of her kids and since [then] she [has been] having more pronounced memory problem[s]." *Id*. at 413. Dr. Rauf then opined that she was "not sure if [Plaintiff] had some kind of inflammation encephalitis that cause[s] the trigger to seizure[s] and memory problem[s] . . ." *Id*.

The record also contains substantial evidence related to Plaintiff's experiences with confusion, and other symptoms and indications of advanced dementia. For example, in March of 2014, Dr. Richmond noted that Plaintiff's complaints about persistent confusion may be explained by a number of possibilities given that "an EEG [] showed generalized slowing indicating a global dysfunction of the central nervous system as in encephalopathy, advanced dementia, [central nervous system] depressing medications[,] or metabolic abnormalities." *Id*. at 502, 507; *see also*

699-700. On other occasions, Plaintiff has complained of other manifestations of memory deficits and confusion such as finding it difficult to remember particular words when speaking, combined with an inability to concentrate. *See id*. at 1272-73, 1278, 1284.

In February of 2018, Plaintiff's husband of 25 years submitted a third-party function report. *See id*. at 318-325. He reported that her illnesses and conditions have combined to affect her ability to handle money due to her memory loss and difficulties with comprehension. *Id*. at 322-23. These symptoms also require her to be given reminders about places to which she might need to go, as well as the fact that she sometimes needs to be accompanied on these visits. *Id*. at 322. He also related that Plaintiff's memory problems have caused her to experience difficulties in maintaining attention, or following instructions (regardless of whether those instructions are written or verbal). *Id*. at 323. He then added that Plaintiff's ability to handles stress is "[n]ot good because her memory goes in and out" and that "she forgets what she's supposed to do." *Id*. at 324. In her own function report (also from February of 2018), Plaintiff noted that she needs to be reminded to take her medications. *Id*. at 329. She then added that her memory loss has affected her ability to handle money. *Id*. at 331. Lastly, Plaintiff stated that her illnesses and conditions have combined to affect her functional abilities as to her memory, concentration, understanding, and her ability to complete tasks. *Id*. at 332.

On August 22, 2017, Plaintiff was referred by the state disability determination agency for a psychological evaluation by Amy Watt, Ph.D., and Dr. Watt produced a report about two weeks later on September 8, 2017. *See id*. at 1235-39. In the course of her examination, Dr. Watt administered the Wechsler Adult Intelligence Scale (4th edition) ("WAIS-IV"), the Wechsler Memory Scale (4th edition) ("WMS-IV"), and both parts of the Trail Making Test ("TMT"). *Id*. at 1235. Plaintiff's performance on the WAIS-IV indicated that she operates in the extremely low range of intellectual functioning given a verbal comprehension index of 58 (a score situated in the bottom 0.3 percentile); perceptual reasoning and working memory indices of 71 (scores situated in the bottom 3rd percentile); and a full scale IQ score of 68. *Id*. at 1237. Plaintiff's performance on the WMS-IV was similarly concerning – her delayed memory index was measured as 76 (a score situated in the bottom 5th percentile). *Id*. at 1238. These scores were characterized by Dr. Watt as

4

such: "[t]he claimant is shown to have an extremely low range of intellectual functioning . . . [and] [s]he has [a] serious impairment in delayed memory." *Id*. at 1237-38. As to the TMT, Dr. Watt noted that "Trails B requires the task of connecting numbers and letters alternatively in order . . . [and Plaintiff] became confused and she was unable to finish this task within a normal range of time . . . [which] indicate[s] that [Plaintiff's] sequential abilities, executive functioning, planning, and organizational skills are seriously impaired as the tasks become more complex." *Id*. at 1238.

Given the above-mentioned test results, as well as Dr. Watt's characterization of the upshot of the results, the court cannot help but to note that Dr. Watt's report contained numerous internal inconsistencies. First, Dr. Watt noted that Plaintiff put forth reasonable effort in completing the testing tasks and that the results are valid. *See id*. at 1237. Next, Dr. Watt's report stated that "[e]ven though the claimant did poorly on the test items, the low scores are likely related to her hearing impairment and physical disability." *Id*. at 1238. Dr. Watt then added that Plaintiff "does not have cognitive impairment or psychological symptoms." *Id*. Of course, this statement stands in stark contrast to Dr. Watt's statements from an earlier portion of *the same page* of her report to the effect that Plaintiff "has serious impairment in delayed memory" or that her "sequential abilities, executive functioning, planning, and organizational skills are seriously impaired as the tasks become more complex." *Id*. at 1238. As to her functional assessment, without providing any detail, clarification, or any explanation whatsoever, Dr. Watt simply concluded that Plaintiff has no impairment whatsoever in any of the areas of work-related functioning because Plaintiff's "difficulties are mostly related to hearing impairment and physical disability." *Id*. at 1239.

A few months later, Plaintiff was again referred (again at the behest of the state disability determination agency) to Thomas H. McCord, Ph.D., for another psychological evaluation. *See id*. at 1287-89. Dr. McCord's evaluation consisted only of a mental status examination and a review of Dr. Watt's report. *Id*. at 1287. In the course of the mental status examination, Dr. McCord noted that Plaintiff "was able to count by threes although she skipped from 9 to 18 [and] [s]he counted by sevens fairly well except she went from 28 to 32 and then continued with 7s after that." *Id*. at 1288. Dr. McCord also noted that Plaintiff's inability to identify various dissimilarities between two animals indicated that she "did not appear capable of abstract logic." *Id*. He also noted that

while Plaintiff "could remember all five digits backwards, [she] could not put them in order [and] did not know basic proverbs." *Id*. Dr. McCord then diagnosed Plaintiff with a dysthymic (mood) disorder and opined that her prognosis was "guarded to poor." *Id*. He also noted that he was "concerned about her capacity to keep pace with co-workers given the issues with hearing and her current physical impairments." *Id*. at 1289. Further, he found that Plaintiff "demonstrates moderate to severe impairment in her concentration, pace, and persistence," but that she shows "no impairment" in any other category of work-related functioning. *Id*.

As to the ALJ's treatment of the evidence, the ALJ rejected Plaintiff's statements about her memory and comprehension problems because – as the ALJ put it – "the record reflects that she has consistently been able to understand health care and discharge instructions . . . [and also because an intake form on one occasion] reflects that the claimant has exhibited normal or logical thought processes . . . [and] that the record indicates that the claimant has generally been able to recall her personal and health care history and been assessed [on intake forms] as having an intact memory." *Id*. 25. The ALJ also premised the rejection of Plaintiff's statements about her memory and comprehension difficulties on the fact that in her function report, Plaintiff did not complain about "being able to understand how to pay bills, count change, [or] handle a savings account." *Id*. Regarding the statements made by Plaintiff's husband, the ALJ largely rejected his observations because of the notion that he "lacks the medical training necessary to make exacting observations as to dates, frequencies, types, and degrees of medicals (sic) signs and symptoms or the frequency or intensity of unusual mood or mannerisms." *Id*. at 27.

As for the opinion evidence, the ALJ stated that she gave "great weight" to Dr. McCord's opinion – which had opined that Plaintiff is moderately to severely impaired in the domains of concentration, persistence, and pace – however, the ALJ made no allowance for this finding in the residual functioning capacity ("RFC") formulation as discussed below. As to Dr. Watt's report, the ALJ gave it "no weight," however, the ALJ failed to explain whether or not she had accepted or rejected the test results for the WAIS-IV, WMS-IV, and TMT test results. *See id*.

//

//

## THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[3] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ set forth the applicable law under the required five-step sequential evaluation process. *AR* at 14-17. At Step One, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since the alleged date on which the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ in this case found that Plaintiff had not engaged in substantial gainful activity since January 1, 2014, the alleged onset date. *AR* at 17. At Step Two, the claimant bears the burden of showing that she has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step Two, the ALJ found that Plaintiff suffered from the following severe impairments: spine disorders, hearing loss, seizure disorder, and dysthymic disorder. *AR* at 17-19.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant

---

[3] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless it is necessary to note otherwise.

is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments. *AR* at 19-22. Next, the ALJ determined that Plaintiff retained the RFC to perform the full range of light work with the following exceptions and limitation: she can never climb ladders, ropes, or scaffolds; she can only occasionally climb ramps and stairs; she can frequently balance, while performing all other postural activities on an occasional basis; she has to avoid concentrated exposure to extreme heat and vibrations; she has to avoid the "concentrated use of" hazardous machinery; she has to avoid the concentrated exposure to unprotected heights; she has to work in a position that does not require "fine hearing"; she can only perform simple work, involving only routine and repetitive tasks; she can only work in a low stress job, such as would only involve occasional decision making and only involve occasional changes in the work setting. *Id*. at 22-27.

At Step Four, the ALJ determined that Plaintiff is unable to perform her past relevant work. *Id*. at 27-28. Lastly, at Step Five, based on the RFC as formulated, and the testimony of the vocational expert ("VE"), the ALJ found that Plaintiff can still perform the functions of certain jobs that exist in significant numbers in the national economy such as a hand packager inspector and a marker. *Id*. at 28-29. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time prior between the alleged onset date, January 1, 2014, and the date of the ALJ's decision, April 17, 2019. *Id*. at 28-29.

## DISCUSSION

At the outset, the court will note that the ALJ's above-discussed reasons for rejecting the statements rendered by Plaintiff and her husband are legally invalid. Where an ALJ discredits a claimant's testimony, "clear and convincing" reasons must be provided. *Valentine v. Comm'r*, 574 F.3d 685, 693 (9th Cir. 2009). Such was not the case here. The above-stated reasons provided by the ALJ for rejecting Plaintiff's statements about her memory and comprehension deficits were unclear and unconvincing. As for the statements from Plaintiff's husband, in order to reject the testimonial statements of a lay-witness, an ALJ must "give[] reasons germane to each witness for

doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). The reasons advanced for rejecting lay-witness testimony must also be "specific." *Stout v. Comm'r, SSA*, 454 F.3d 1050, 1054 (9th Cir. 2006). The ALJ's reasoning for rejecting the lay testimony in this case was wholly invalid and fell short of these standards. It is neither germane nor specific to effect a wholesale disregard of the statements of Plaintiff's husband about Plaintiff's memory and comprehension lapses by simply declaring that he "lacks the medical training necessary exacting observations as to dates, frequencies, types, and degrees" related to Plaintiff's memory and comprehension deficits. If this were true, then an utterly absurd result would follow where only persons with "medical training" would be capable of even the most basic observations about when or how often something happened. On remand, the Commissioner is **ORDERED** to credit Plaintiff's statements (as well as those of her husband) described herein as true.[4]

---

[4] This court will not allow the ALJ to have a second chance to do what should have been done correctly in the first place. *See Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."); *see also Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004) ("The Commissioner, having lost this appeal, should not have another opportunity to show that Moisa is not credible any more than Moisa, had he lost, should have an opportunity for remand and further proceedings to establish his credibility."); *Baltazar v. Berryhill*, No. CV 16-8132-E, 2017 U.S. Dist. LEXIS 83515, at *20-21 (C.D. Cal. May 31, 2017) ("Accordingly, on remand the Administration shall credit as true Dr. Rubinstein's opinion regarding Plaintiff's lifting capacity and shall conduct further proceedings to determine whether Plaintiff is entitled to benefits prior to January 19, 2014."); *Stimson v. Colvin*, 194 F. Supp. 3d 986, 1004 (N.D. Cal. 2016) ("The Court therefore remands for further proceedings. In keeping with the purposes underlying the credit-as-true rule, the Commissioner is instructed on remand to accept Dr. Hoque's diagnosis for the period from September 23, 2011 until Stimson's July 2012 surgery and to devote further administrative proceedings to determining Stimson's ability to work after his surgery."); *S.W. v. Colvin*, No. CV 15-3189-PLA, 2016 U.S. Dist. LEXIS 72834, at *8 (C.D. Cal. June 2, 2016) ("in its previous remand order, which instructed the ALJ on remand to credit as true William's statements concerning plaintiff's limitations . . ."); *Page v. Colvin*, 2016 U.S. Dist. LEXIS 161286, 2016 WL 6835075, at *6 (N.D. Cal. Nov. 20, 2016) ("the Treichler rule should not be interpreted to require that an ALJ be given a second chance to do what the ALJ should have done correctly in the first place"); *Derr v. Colvin*, No. CV-12-00415-TUC-BPV, 2014 U.S. Dist. LEXIS 143961, at *39-40 (D. Ariz. Oct. 8, 2014) ("Accordingly, the Court will reverse the Commissioner's final decision with a remand for further proceedings consistent with this opinion. The ALJ shall, on remand, credit Dr. Mittleman's opinion as true, and credit Plaintiff's statements as true. On remand the ALJ shall make a determination regarding onset date and reviewable findings regarding substance use."); *Adame v. Colvin*, No. EDCV 12-1079 AGR, 2013 U.S. Dist. LEXIS 87694, at *17 (C.D. Cal. June 21, 2013) ("the decision of the Commissioner is reversed and this matter remanded for further proceedings consistent with this opinion. Dr. Sophon's lift/carry restriction must be credited as true on remand."); *McNeill v. Colvin*, 2013 U.S. Dist. LEXIS 24752, 2013 WL 645719, at *8 (C.D. Cal. 2013) (crediting treating physicians' opinions as true and remanding for further administrative proceedings rather than giving the ALJ a third opportunity to provide legally sufficient reasons for rejecting a treating physicians' opinions); *Smith v. Astrue*, 2011 U.S. Dist. LEXIS 101057, 2011 WL 3962107, at *8 (C.D. Cal. Sept. 8, 2011) (same); *Toland v. Astrue*, 2011 U.S. Dist. LEXIS 15411, 2011 WL 662336, at *8 (C.D. Cal. Feb. 14, 2011) (same).

As to the issues related to the state of the record before this court, several applicable legal principles must be discussed. First, the court will note the ALJ's duty to develop the record in such a manner as to allow for a full and fair disability determination. This "duty to fully and fairly develop the record" is meant to "assure that [a] claimant's interests are considered." *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 930 (9th Cir. 2014) (citation omitted); *see also Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) ("In making a determination of disability, the ALJ must develop the record and interpret the medical evidence."). Further, an ALJ's duty to develop the record "further" is triggered – as is the case here – when there is "ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *See McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2010) (as amended May 19, 2011) (citation omitted). It should also be noted that an ALJ has broad discretion in determining whether to order further consultative examinations when it may be necessary to resolve ambiguities or other inadequacies in the body of evidence. *See Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir. 2001) (citation omitted); *see also* 20 C.F.R. § 404.1519a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim."); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" (citing *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). This duty to develop the record is incumbent and applicable even when claimants are represented by counsel. *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). Lastly, "[i]n cases of mental impairments, this duty is especially important." *See DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1990); *see also Tonapetyan*, 242 F.3d at 1150 ("The ALJ's duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect her own interests.").

Second, the court will note that while Plaintiff has not raised an issue regarding the ALJ's failure to develop the record, the court can raise and address the issue *sua sponte*. Not only is the court not precluded from raising such an issue *sua sponte*, but the court has an independent duty to determine whether the ALJ's findings (in every regard) are supported by substantial evidence –

10

this is so because an appeal from the denial of Social Security benefits is rather unlike ordinary civil litigation because the underlying claims process before the ALJ is not adversarial. *See Sims v. Apfel*, 530 U.S. 103, 110 (2000). While claimants must carry the burden of demonstrating that they qualify for benefits, the law does not leave them entirely to their own devices; consequently, lapses and omissions in pleading or procedure cannot be relied upon to withhold benefits from a claimant who may otherwise be entitled to them. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 n.3 (9th Cir. 1999). Therefore, when such a case is before this court, while a plaintiff must make her own arguments for remand, that does not relieve this court of its independent duty to effect a fulsome and searching review of the facts and to render a thorough and independent determination as to whether the ALJ's findings are supported by substantial evidence. *Stone v. Heckler*, 761 F.2d 530, 532 (9th Cir. 1985). In therefore cannot be reasonably contended that the failure by a Plaintiff or her counsel to raise an error is an acceptable reason for a court to actively ignore it. *See Ariz. State Dep't of Pub. Welfare v. Dep't of Health, Educ. & Welfare*, 449 F.2d 456, 472 (9th Cir. 1971); *Hess v. Sec'y of Health, Educ. & Welfare*, 497 F.2d 837, 840 (3d Cir. 1974); *see also Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). A significant number of courts faced with this issue have arrived at a similar conclusion. *See e.g., Farley v. Colvin*, 231 F. Supp. 3d 335, 339-41 (N.D. Cal. 2017) (collecting cases standing for the proposition that while a remand request is normally made by a party, there is no reason why a district court may not remand, *sua sponte*, for an error that was not raised); *see also Cortes v. Berryhill*, No. 3:16-cv-01910 (JCH), 2018 U.S. Dist. LEXIS 45256, 2018 WL 1392903, at *2-6 (D. Conn. March 19, 2018) (court *sua sponte* raised issue of ALJ's failure to develop the record and reversed and remanded because it "could not ignore" a gap in record of mental health treatment); *Peterson v. Commissioner of Social Security Admin.*, No. 16-2912, 2018 U.S. Dist. LEXIS 26355, 2018 WL 953345, at *1 n.1 (D. N.J. Feb. 20, 2018) (same); *Taylor-Tillotson v. Colvin*, No. 13-80907-CIV-WM, 2014 U.S. Dist. LEXIS 177510, 2014 WL 7211888, at *13 (S.D. Fl. Dec. 18, 2014) ("A reviewing court may *sua sponte* address issues in social security cases"); *Mangan v. Colvin*, No. 12 C 7203, 2014 U.S. Dist. LEXIS 120515, 2014 WL 4267496, at *1 (N.D. Ill. Aug. 28, 2014) (same); *Gravel v. Barnhart*, 360 F. Supp. 2d 442, 452 n.24 (N.D.N.Y. 2005) (noting additional issues that warrant remand *sua*

11

*sponte*).

Third, there are special requirements and procedures that an ALJ must follow when the record manifests evidence of intellectual disability in the form of IQ scores. Social Security Listing 12.05, pertaining to intellectual disability, "is based on the three elements that characterize intellectual disorder: [s]ignificantly subaverage general intellectual functioning; significant deficits in current adaptive functioning (discussed below); and a finding that the disorder manifested before age 22." *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00B(4). Significantly subaverage general intellectual functioning may be established by a full scale IQ score of 70 or below or a full scale IQ score of 70-75 with a verbal performance IQ score of 70 or below. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.05B. Here, Plaintiff's full scale IQ score is 69, however, while the ALJ effected a wholesale rejection of Dr. Watt's opinions (which had themselves casually dismissed Plaintiff's WAIS-IV and WMS scores), the ALJ's decision neither accepted nor rejected Plaintiff's intelligence scale or memory scale scores – the ALJ simply overlooked the scores. *See* AR at 26-27.

This is an error that this court cannot overlook – regardless of the fact that the error was not raised in the briefing before this court. IQ testing plays a uniquely prominent role in assessing the existence of intellectual disability. Listing 12.00 generally lays out the necessary procedures for evaluating mental disorders, including intellectual disability, and for documenting relevant objective findings. At Step Three of the sequential evaluation process, when a claimant's impairment is compared to the criteria in Listing 12.05, three of the four criteria for intellectual disability rely in whole or in part on IQ test scores (the fourth criterion applies when the claimant's incapacity precludes IQ testing.) Because meeting the relevant listing conclusively determines that a claimant is indeed disabled, 20 C.F.R. § 416.920(a)(4)(iii), the claimant's IQ score is often the deciding factor in a determination of intellectual disability.

Then, as also appears to be the case here, WAIS and WMS test results can also play a prominent role in the development of other evidence in the record. For example, two consultative examiners in this case opined (respectively) that Plaintiff "has [a] serious impairment in [her] delayed memory," and that her "sequential abilities, executive functioning, planning, and

organizational skills are seriously impaired as the tasks become more complex," (Dr. Watt, see AR at 1238); additionally, the record also reflects concerns about Plaintiff's "capacity to keep pace with co-workers given the issues with hearing and her current physical impairments" (Dr. McCord, see *id*. at 1289). The court finds error (at the very least) in the failure to account for these findings in the sequential evaluation process. However, an error of even greater magnitude exists in the ALJ's failure to fully and fairly develop the record regarding Plaintiff's clearly manifest deficits in memory and perhaps also her cognitive abilities. The IQ scores, and these concerns regarding Plaintiff's memory and comprehension should have triggered the ALJ's duty to further develop the record – instead of being the subject of concern and alarm, this information was simply ignored.

Further underscoring the extent of the ALJ's errors in failing to consider this data or to properly develop the record as to Plaintiff's cognitive and memory-related issues, some discussion should be devoted to the fact that the importance of Plaintiff's WAIS, WMS, and TMT scores in this case do not end with the analysis at Step Three. *See Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 930-31 (9th Cir. 2014). As to Plaintiff's IQ score of 69, in *Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001), the Eleventh Circuit articulated a rationale for the imposition of a presumption of validity of IQ scores because of the fact that they generally remain fairly constant throughout a person's life – thus, *Hodges* concluded that "[t]his circuit implicitly recognized that a claimant meets the criteria for presumptive disability under Listing 12.05(C) when the claimant presents a valid IQ score of 60 to 70 and evidence of additional mental or physical impairment." *Id*. at 1269 (citing *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001); *Luckey v. U.S. Dep't of Health and Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989)); *see also Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986) (concluding that an IQ score taken after the insured period presumptively "reflects the person's IQ during th[at] insured period"); *Morgan-Gomez v. Colvin*, No. ED CV13-53-AS, 2013 U.S. Dist. LEXIS 179183, at *19-20 (C.D. Cal. Dec. 20, 2013). Because *Hodges*'s reasoning as to the presumption of IQ testing validity is persuasive, a number of courts have adopted it. *See e.g.*, *Flores v. Astrue*, No. 11-10714, 2013 U.S. Dist. LEXIS 5367, 2013 WL 146190, at *4 (C.D. Cal. Jan. 11, 2013); *Woods v. Astrue*, No. 10-2031, 2012 U.S. Dist.

LEXIS 30211, 2012 WL 761720, at *3-4 (E.D. Cal. Mar. 7, 2012); *Forsythe v. Astrue*, No. 11-01515, 2012 U.S. Dist. LEXIS 7744, 2012 WL 217751, at *7 (E.D. Cal. Jan. 24, 2012); *Campbell v. Astrue*, No. 09-00465, 2011 U.S. Dist. LEXIS 13742, 2011 WL 444783, at *16-17 (E.D. Cal. Feb. 8, 2011); *Schuler v. Astrue*, No. 09-2126, 2010 U.S. Dist. LEXIS 34744, 2010 WL 1443892, at *6 (C.D. Cal. Apr. 7, 2010); *Walberg v. Astrue*, No. 08-0956, 2009 U.S. Dist. LEXIS 51322, [WL] at *8-9 (W.D. Wash. June 18, 2009); *Jackson v. Astrue*, No. 08-1623, 2008 U.S. Dist. LEXIS 100411, 2008 WL 5210668, at *6 (C.D. Cal. Dec. 11, 2008); *Morgan-Gomez v. Colvin*, No. ED CV13-53-AS, 2013 U.S. Dist. LEXIS 179183, at *25-26 (C.D. Cal. Dec. 20, 2013). Thus, while it is possible for the presumption of their validity to be rebutted, such cannot be reasonably contended to have happened when Dr. Watt's report causally mused that Plaintiff's poor performance on the WAIS and WMS were *likely* the function of her poor hearing and her physical impairments; and, in any event, the ALJ's stated reason for rejecting Dr. Watt's opinions was that she failed to find that Plaintiff's abilities were impaired to any degree.

In *Thresher v. Astrue*, 283 Fed. App'x 473, 474-75 (9th Cir. 2008), a plaintiff had advanced evidence (including IQ scores) tending to establish that she met Listing § 12.05 via what was then paragraph C of that listing. *See id*. Although the ALJ had suggested that Thresher was not intellectually disabled, the ALJ did not reference Listing § 12.05 in her decision. *Id*. at 475. Notwithstanding the ALJ's failure to reference the listing, the district court upheld the decision, reasoning that it was supported by substantial evidence. See *Thresher v. Barnhart*, No. 06-5071, 2006 U.S. Dist. LEXIS 101397 (W.D. Wash. Oct. 20, 2006); Order Adopting Report & Recommendation, No. 06-5071, 2007 U.S. Dist. LEXIS 103082 (W.D. Wash. Jan. 8, 2007). Specifically, the district court found that the ALJ could have rejected the IQ scores on the basis of (1) a psychiatric expert's opinion that Thresher was not intellectually disabled, and (2) on the basis of Thresher's daily activities and behavior. *See* Report & Recommendation at 3-4, *Thresher v. Barnhart*, No. 06-5071, 2006 U.S. Dist. LEXIS 101397 (W.D. Wash. Oct. 20, 2006). On appeal, the district court's decision was reversed. *See Thresher*, 283 Fed. App'x at 474. The appellate court reasoned that the ALJ's failure to explicitly reject the IQ score indicated that "it [was] unclear whether the ALJ came to grips with the specific requirements of [Listing § 12.05] when

14

she issued her decision." *Id*. at 475. The same can be said about the ALJ's failure in this case because the ALJ in this case did not cast any doubt on the validity of Plaintiff's WAIS, WMS, or TMT scores. Accordingly, remand for clarification and further record development is unavoidable such that the ALJ can articulate "precisely what was decided and why." *Id*. (citing *Pinto v. Massanari*, 249 F.3d 840, 848 (9th Cir. 2001); *Christner v. Astrue*, 498 F.3d 790, 794 (8th Cir. 2007)).

In light of Dr. Watt's speculative and – to put it frankly – dubious rejection of Plaintiff's IQ test results (discussed above), the court concludes that a fresh consultative examination is necessary. On remand, the Commissioner is **ORDERED** to contract another consultative examiner to (1) review Plaintiff's performance on the WAIS, the WMS, and the TMT and (if possible) to opine on the validity of those scores or, if necessary, to administer another battery of WAIS, WMS, and TMT testing (in addition to any other diagnostic instruments or clinical observations that might be deemed necessary or useful by the examining professional); and (2) instructing the consultative examiner to thoroughly develop the record regarding the adaptive functioning deficits (if any) that Plaintiff may have been experiencing during the course of her life. Adaptive functioning refers to a claimant's "[ ]ability to cope with the challenges of ordinary everyday life." *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007). It evaluates a person's "effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009) (quoting *Heller v. Doe*, 509 U.S. 312, 329 (1993). "The term 'adaptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age. Indicators of adaptive behavior include . . . educational and social achievements." *Lyons v. Colvin*, No. 7:13-CV-00614, 2014 U.S. Dist. LEXIS 137002, 2014 WL 4826789, at *10 (N.D.N.Y. Sept. 29, 2014) (citing POMS DI 24515.056D2). Examples of evidence supporting a finding of deficits in adaptive functioning can include "special education classes, dropping out of high school prior to graduation, difficulties in reading, writing or math, and low skilled work history." *Campbell v. Astrue*, No. 1:09-CV-00465 GSA, 2011 U.S. Dist. LEXIS 13742, 2011 WL 444783, at *17 (E.D. Cal. Feb. 8, 2011); *see also Lyons v. Colvin*, No.

7:13-CV-00614, 2014 U.S. Dist. LEXIS 137002, 2014 WL 4826789, at *9 (N.D.N.Y. Sept. 29, 2014) ("[A]ttendance in special education classes and an education pursuant to an IEP have been construed as factors indicative of deficits in adaptive functioning."); *Forsythe v. Astrue*, No. 1:10-CV-01515 AWI, 2012 U.S. Dist. LEXIS 7744, 2012 WL 217751, at *7 (E.D. Cal. Jan. 24, 2012) ("Courts have found that circumstantial evidence can infer a deficit in adaptive functioning."); *Aminzadeh v. Comm'r of Soc. Sec.*, No. 1:10-CV-01068 GSA, 2011 U.S. Dist. LEXIS 84663, 2011 WL 3322798, at *8 (E.D. Cal. Aug. 2, 2011) (finding deficits in adaptive functioning where, although, "Plaintiff did graduate from high school, the record establishes that she attended special education classes and had difficulty in the areas of reasoning, memory, and attention.").

Thus, because the court is remanding for further proceedings that would require a great deal of further record development, the court declines to address Plaintiff's remaining issues not only because they can be adequately addressed on remand, but also because the calculus underlying those issues will quite likely change on remand given the holdings expressed herein. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Gutierrez v. Comm'r of Soc. Sec.*, No. 18-cv-02348-RMI, 2019 U.S. Dist. LEXIS 165711, at *30-31 (N.D. Cal. Sep. 25, 2019); *Abdul-Ali v. Berryhill*, No. 18-cv-03615-RMI, 2019 U.S. Dist. LEXIS 138512, 2019 WL 3841995, at *7 (N.D. Cal. Aug. 15, 2019); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

In any event, on remand, the Commissioner is **ORDERED** to consider the other issues raised in Plaintiff's briefing and to modify any ensuing ALJ opinion such as to reflect the fact that the issues raised in this case by Plaintiff have been considered and addressed. *See Cortes v. Colvin*, No. 2:15-cv-02277-GJS, 2016 U.S. Dist. LEXIS 40580, 2016 WL 1192638, at *4 (C.D. Cal. Mar. 28, 2016); *Cochran v. Berryhill*, No. 3:17-cv-00334-SB, 2017 U.S. Dist. LEXIS 212380, at *21 (D. Or. Dec. 28, 2017); *Steven M. v. Saul*, No. 19-cv-06991-RMI, 2021 U.S. Dist. LEXIS 52225, at *16-17 (N.D. Cal. Mar. 19, 2021).

**CONCLUSION**

As described above, Plaintiff's summary judgment motion (dkt. 23) is **GRANTED**, Defendant's summary judgment motion (dkt. 30) is **DENIED**, and the case is **REMANDED** for further proceedings consistent with the instructions provided herein.

**IT IS SO ORDERED.**

Dated: March 1, 2022

_____
ROBERT M. ILLMAN
United States Magistrate Judge